UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| IGNACIO ALVAREZ, | ) |
| Plaintiff, | ) |
| | ) No. 13 C 703 |
| v. | ) |
| | ) Judge Sara L. Ellis |
| WEXFORD HEALTH SOURCES, INC., et al., | ) |
| Defendants. | ) |

## OPINION AND ORDER

Having sprained his ankle playing basketball while incarcerated at Stateville Correctional Center ("Stateville"), Plaintiff Ignacio Alvarez sought medical treatment for the sprain and chronic pain he experienced. Dissatisfied with the medical care he received, he filed this § 1983 deliberate indifference suit against Defendants Wexford Health Sources, Inc. ("Wexford"), Arthur Funk, M.D., Imhotep Carter, M.D., and Saleh Obaisi, M.D. (collectively, the "Wexford Defendants"), as well as Marcus Hardy and Royce Brown-Reed (collectively, the "IDOC Defendants"). Both the Wexford and IDOC Defendants have filed motions for summary judgment. Because Alvarez cannot demonstrate that Dr. Carter, Dr. Funk, Hardy, or Brown-Reed acted with deliberate indifference to his ankle injury and he has abandoned his claim against Wexford, the Court grants judgment in their favor. But because questions of fact exist as to whether Dr. Obaisi's treatment of Alvarez demonstrates deliberate indifference, Alvarez's claim against Dr. Obaisi must proceed to trial.

# BACKGROUND[1]

Alvarez challenges the medical care and treatment he received while an inmate at Stateville. Hardy was Stateville's warden from 2009 to 2012. Brown-Reed was Stateville's health care unit administrator during the relevant time. Wexford, a private corporation, has a contract with the Illinois Department of Corrections ("IDOC") to provide medical services to inmates at IDOC facilities, including Stateville. Dr. Funk has served as Wexford's Regional Medical Director for the Northern Region of Illinois, which includes Stateville, since 2005.[2] Dr. Carter was a physician and Stateville's medical director from July 25, 2011 to May 10, 2012. Dr. Obaisi followed Dr. Carter as Stateville's medical director beginning in August 2012, although he worked as a physician there before assuming the medical director position.

On August 11, 2011, Alvarez injured his left ankle playing basketball in Stateville's night yard. A medical technician took Alvarez from the yard in a wheelchair to the health care unit infirmary, where nurses evaluated his ankle and gave him an ice pack. They admitted Alvarez to the infirmary, where he received pain medication. Alvarez's medical chart indicates he suffered from swelling, bruising, tenderness, limited range of motion, and joint pain that night. The next morning, Dr. Carter evaluated Alvarez. He diagnosed Alvarez with a left ankle sprain and sent him out for x-ray imaging. When Alvarez returned, he received crutches and pain medication

---

[1] The facts in this section are derived from the Joint Statement of Undisputed Material Facts, Alvarez's statements of facts included in his responses to the IDOC and Wexford Defendants' motions for summary judgment, and the IDOC and Wexford Defendants' responses to Alvarez's statements of facts. The Court has considered the IDOC and Wexford Defendants' objections to Alvarez's statements of fact and supporting exhibits, as discussed below, and has included in this background section only those portions of the statements and responses that are appropriately presented, supported, and relevant to resolution of the pending motion for summary judgment. All facts are taken in the light most favorable to Alvarez, the non-movant.

[2] Dr. Funk testified that he does not independently recall ever treating Alvarez for any complaints concerning his left ankle. Nor do Alvarez's medical records contain any notations by Dr. Funk.

and was discharged to his cell. A correctional officer informed Alvarez that his x-ray did not reveal a break. Dr. Carter prescribed Alvarez a medical permit for crutches and a lay-in until August 15, 2011. Alvarez recalls using the crutches for approximately four to eight weeks. Alvarez periodically placed his name on the sick call for follow-up examinations. Sometimes, however, he could not make appointments because Stateville would be on lockdown. When the medical staff at Stateville did see him, they prescribed Alvarez medication to alleviate the pain in his ankle. Alvarez acknowledges that he always had enough pain medication.

After tending to Alvarez immediately after his injury, no one on the medical staff saw him again until December 1, 2011. Before that, however, on October 12, he wrote to Dr. Carter, copying Dr. Funk, Brown-Reed, and Hardy, to complain that he had not been seen by a doctor or orthopedic specialist after August 12 even though he was in acute pain. He also wrote separate letters that same day to Dr. Carter, asking for an MRI, and to Hardy, asking for additional help, because he believed his injury was more serious than diagnosed.[3]

On November 22, Alvarez requested a nursing appointment to follow up on his ankle injury. A nurse saw him on December 1, and noted subjective complaints of left ankle pain and swelling. She recommended a follow-up with a doctor. On December 9, Dr. Anton Dubrick saw Alvarez, who also noted complaints of ankle pain and swelling, and prescribed pain medication and another follow-up after a new x-ray was taken. On December 15, the x-ray came back negative. On January 10, 2012, Alvarez wrote to Hardy, asking again for an MRI and to see a foot specialist.[4]

---

[3] The record does not include a certificate of service or any other proof of mailing for these letters or whether any of these Defendants received the letters.

[4] Again, the record does not indicate whether Alvarez sent this letter or whether Hardy received or read it.

On January 31, 2012, Dr. Carter saw Alvarez. He noted that Alvarez had recurrent pain in his left ankle but no new injury. Based on this and the negative x-ray from December, Dr. Carter diagnosed Alvarez with post-traumatic tendonitis and recommended a steroid injection to relieve his pain. Alvarez received a cortisone shot on February 2. On February 12, Alvarez again wrote to Dr. Funk asking for help in obtaining medical treatment.[5] On March 13, Alvarez did not appear for a physical. But on March 15, he saw Dr. Carter, reporting that the cortisone shot did not relieve his ankle pain. Dr. Carter referred Alvarez to the University of Illinois Chicago Medical Center ("UIC") for an orthopedic evaluation of his foot. Wexford reviewed and approved the referral on March 19. It took until June 14 for Alvarez to see the UIC orthopedic physician.[6] An x-ray taken at UIC came back negative.[7] The UIC orthopedic physician recommended physical therapy, an ankle brace, and a follow-up, and Alvarez received a list of exercises he could perform inside his cell. Alvarez testified he tried performing the exercises but that his mobility did not improve. Alvarez also did not return to UIC for a follow-up.

On the same day as his UIC visit, Alvarez was also seen at the health care unit at Statesville. Notes from that day indicate Alvarez could walk on his left ankle without distress. On June 30, Alvarez saw Dr. Obaisi and discussed the UIC specialist's findings with him. Dr. Obaisi prescribed pain medication for him and noted plans to follow up on the UIC specialist's recommendations. On August 25, a nurse measured Alvarez for an ankle brace and noted in his

---

[5] As with Alvarez's other letters, the record does not reflect that Alvarez sent the letter or that Dr. Funk received or read it.

[6] Dr. Carter and Dr. Obaisi stated they do not personally schedule referrals to outside medical facilities.

[7] Alvarez requested an MRI when at UIC and on several other occasions, but no doctor he saw recommended an MRI.

4

file that she placed an order for it. On September 4, 2012, Alvarez's follow-up appointment was rescheduled because Dr. Obaisi was not present that day. That same day, Alvarez wrote Dr. Obaisi complaining that he had yet to receive the treatment recommended by the UIC orthopedic specialist and asking for Dr. Obaisi's help in receiving it.[8] Alvarez next saw Dr. Obaisi on September 26. Dr. Obaisi noted no acute findings although he acknowledged that Alvarez had not yet received his ankle brace.

Alvarez did not receive his ankle brace until April 2, 2013.[9] Alvarez testified that he subsequently decided to stop wearing his ankle brace and allowed the medical permit authorizing the brace's use to expire because the brace was not working, making the brace "useless" because he still experienced pain. Doc. 115 ¶ 34. Alvarez did not consult with any doctor or medical staff in deciding to stop wearing the brace. On August 30, 2013, Alvarez's order for physical therapy was cancelled, based on the fact that he had not complained of ankle pain since September 2012. Alvarez did receive physical therapy for his ankle between August and November 2014. When Alvarez saw Dr. Obaisi on December 29, 2014, Dr. Obaisi noted that, since receiving physical therapy, Alvarez had not had ankle pain. In their professional medical opinions, having reviewed Alvarez's medical records, Dr. Carter, Dr. Obaisi, and Dr. Funk testified that their own involvement and all Wexford-employed healthcare personnel's medical care and treatment of Alvarez complied with all applicable community standards of medical care.

---

[8] Again, there is no evidence in the record as to whether Alvarez sent the letter or Dr. Obaisi actually received or read it.

[9] Dr. Carter and Dr. Obaisi both testified that once an order is placed for an ankle brace, they as medical directors would have no further role in ensuring that a prisoner, like Alvarez, receives the ankle brace, instead relying on the Stateville medical and correctional staffs to ensure that the prisoner receives the brace.

Regarding administrative grievances surrounding his medical treatment, Alvarez filed a formal grievance in which he sought "proper medical attention specifically an M.R.I. on ankle" on September 4, 2011.  Doc. 115-1 at 46.  On December 27, Anna McBee, a grievance officer, denied Alvarez's grievance after reviewing his medical records, which indicated that Alvarez appeared to be receiving appropriate medical attention.  Hardy signed off on McBee's findings on January 3, 2012.  Alvarez appealed the denial of his grievance on January 25, 2012.  On June 18, 2012, IDOC's administrative review board recommended denying the grievance based on Alvarez receiving continued treatment for his ankle.  On July 8, 2012, Alvarez filed a new grievance, asking for his UIC medical files and requesting treatment based on the recommendations of the UIC orthopedic physician.  Hardy denied the grievance as an emergency, indicating it should be filed through the normal process.

**LEGAL STANDARD**

Summary judgment obviates the need for a trial where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56.  To determine whether a genuine issue of fact exists, the Court must pierce the pleadings and assess the proof as presented in depositions, answers to interrogatories, admissions, and affidavits that are part of the record.  Fed. R. Civ. P. 56 & advisory committee's notes.  The party seeking summary judgment bears the initial burden of proving that no genuine issue of material fact exists.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).  In response, the non-moving party cannot rest on mere pleadings alone but must use the evidentiary tools listed above to identify specific material facts that demonstrate a genuine issue for trial.  *Id.* at 324; *Insolia v. Philip Morris Inc.*, 216 F.3d 596, 598 (7th Cir. 2000).  Although a bare contention that an issue of fact exists is insufficient to create a factual dispute, *Bellaver v.*

6

*Quanex Corp.*, 200 F.3d 485, 492 (7th Cir. 2000), the Court must construe all facts in a light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).

## ANALYSIS

I.     Motion to Strike and Other Procedural Issues

Before addressing the merits of Alvarez's claim, the Court must address several procedural issues. The Court's summary judgment procedures differ from Local Rule 56.1, in that this Court requires the parties to submit a joint statement of undisputed facts. *See Sweatt v. Union Pac. R.R. Co.*, 796 F.3d 701, 711–12 (7th Cir. 2015) (affirming this Court's summary judgment case management procedures). The party opposing summary judgment may, however, submit additional facts it contends demonstrate a genuine issue of material fact in its response, providing citations to supporting material. *Id.*; Judge Sara L. Ellis, Case Procedures, Summary Judgment Practice, http://www.ilnd.uscourts.gov/judge-info.aspx?VyU/OurKKJRDT+FUM5tZmA==. These additional facts must be genuinely disputed; the non-moving party may not use the response as an opportunity to sidestep the joint process. *See* Judge Sara L. Ellis, Case Procedures, Summary Judgment Practice ("The parties may not file – and the Court will not consider – separate statements of undisputed facts."). Here, Alvarez includes in his responses his own narrative of facts, citing not only to the parties' joint statement but also to additional supporting material where his recitation of the facts is not supported by the joint statement. Defendants take issue with Alvarez providing his own narrative, arguing that this undermines the joint process. The Court agrees that, to the extent Alvarez relies on undisputed facts, those facts should have been included in the joint statement of facts. But as Defendants must admit, some

of Alvarez's additional facts are disputed, allowing the Court to consider them in resolving the pending motions.

Additionally, the Wexford Defendants, joined by the IDOC Defendants, move to strike the declaration of Edgar Naranjo, which Alvarez attached to his response to the Wexford Defendants' motion for summary judgment.[10] Alvarez did not provide Defendants with a copy of Naranjo's declaration prior to filing his response to the summary judgment motions.[11] Naranjo's declaration is dated June 6, 2016 and was filed by Alvarez (and first received by Defendants) on August 1, 2016. Fact discovery closed on January 16, 2015. Although the Court recruited counsel for Alvarez after that date, his counsel represented to the Court on October 7, 2015 that he did not need further discovery. As the parties worked on their joint statement of facts, with Defendants providing declarations from Dr. Carter, Dr. Funk, and Dr. Obaisi at that time, Alvarez did not do the same. Instead, Alvarez chose to disclose Naranjo's declaration almost four months after the parties submitted their joint statement of facts and Defendants filed their summary judgment motions, attempting to raise additional issues that should have been explored prior to the parties expending time and money on the joint statement of facts and crafting their arguments for summary judgment based on the known universe of facts. This unfairly prejudiced and surprised Defendants. *See Bamcor LLC v. Jupiter Aluminum Corp.*, 767 F. Supp. 2d 959, 970 (N.D. Ind. 2011) ("A party cannot wait until the opposing side points out it lacks evidence to procure evidence to support its claim."). As a result, Defendants cannot be

---

[10] Alvarez filed a motion for leave to file a sur-reply to Defendants' motion to strike [154]. Alvarez filed this motion and noticed it for the ruling date the Court set on Defendants' motion for summary judgment. The Court denies Alvarez's motion for leave to file a sur-reply; further, Alvarez's sur-reply would not have altered the Court's analysis regarding Defendants' motion to strike Naranjo's affidavit.
[11] The parties dispute whether Naranjo was disclosed as a witness during discovery. Alvarez was not represented when discovery was formally open, but he did identify Naranjo as an individual who observed his injury during his deposition. Defendants' awareness of Naranjo as a potential witness is not dispositive of the motion to strike, however.

faulted for not having acted during discovery to depose Naranjo, having received little indication that Alvarez would attempt to rely on his testimony to defend against summary judgment.  *Cf. Buffone v. Rosebud Rests., Inc.*, No. Civ. A 05C5551, 2006 WL 2425327, at *3 (N.D. Ill. Aug. 21, 2006) (refusing to bar witness at trial who was identified by plaintiff at deposition but not in Rule 26(a)(1) disclosure where defendant did not exercise diligence in attempting to depose witness prior to close of discovery after witness was identified).  Therefore, the Court strikes the Naranjo declaration and disregards any statements of fact dependent on it.[12]  *See Lynch v. Vill. of Hawthorn Woods*, No. 10 C 5707, 2013 WL 389019, at *5–6 (N.D. Ill. Jan. 31, 2013) (refusing to consider testimony of witness disclosed after summary judgment motion was filed, finding that late disclosure was not substantially justified and that admission would be harmful and prejudicial where defendants had structured their arguments based on facts as existed without disclosure).

## II.     Deliberate Indifference Claim

Correctional officials and health care providers may not act with deliberate indifference to an inmate's serious medical needs.  *Estelle v. Gamble*, 429 U.S. 97, 104, 97 S. Ct. 285, 50 L. Ed. 2d 251 (1976); *Fields v. Smith*, 653 F.3d 550, 554 (7th Cir. 2011).  Deliberate indifference has both an objective and a subjective element: (1) the inmate must have an objectively serious medical condition, and (2) the defendant must be subjectively aware of and consciously disregard the inmate's medical need.  *Farmer v. Brennan*, 511 U.S. 825, 834, 114 S. Ct. 1970,

---

[12] Were the Court to consider Naranjo's declaration, it would not be sufficient to create a genuine dispute of fact, as Naranjo merely describes what happened on the day that Alvarez injured his ankle.  No one disputes that Alvarez injured his ankle.  These additional facts do not affect the Court's determination of whether Defendants were deliberately indifferent to Alvarez's medical needs; they only provide context as to how Alvarez injured his ankle.

9

128 L. Ed. 2d 811 (1994); *Roe v. Elyea*, 631 F.3d 843, 857 (7th Cir. 2011). Defendants argue that Alvarez's claim fails on both elements.

### A. Objectively Serious Medical Condition

First, the Wexford Defendants argue that Alvarez did not suffer from an objectively serious medical condition. An objectively serious medical condition is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *King v. Kramer*, 680 F.3d 1013, 1018 (7th Cir. 2012) (quoting *Zentmyer v. Kendall County*, 220 F.3d 805, 810 (7th Cir. 2000)). A condition is also objectively serious if a "failure to treat [it] could result in further significant injury or the unnecessary and wanton infliction of pain." *Hayes v. Snyder*, 546 F.3d 516, 522 (7th Cir. 2008) (citation omitted). But not "every ache and pain or medically recognized condition" constitutes a serious medical need. *Gutierrez v. Peters*, 111 F.3d 1364, 1372 (7th Cir. 1997) (noting that, for example, the failure to treat a common cold is not deliberate indifference). Courts are divided as to whether an ankle sprain, like that suffered by Alvarez, constitutes an objectively serious medical condition. *Compare Bacon v. Harder*, 248 F. App'x 759, 761 (7th Cir. 2007) (finding "[a]mple evidence in the record" to support the district court's determination that ankle sprain was not a serious medical need); *Harvey v. Ghosh*, No. 11 C 6716, 2015 WL 8329876, at *5 (N.D. Ill. Dec. 9, 2015) (sprained ankle and chronic ankle pain resulting from sprained ankle injury that occurred while playing basketball did not amount to an objectively serious injury where there was evidence that plaintiff continued playing basketball despite the condition), *with Smith v. Perez*, No. 13 C 3490, 2015 WL 5821442, at *2 (N.D. Ill. Oct. 2, 2015) (whether plaintiff's complaints of "excruciating pain in his feet" was a "sufficiently serious medical condition for the purposes of a deliberate indifference claim" was a jury question); *Byrd*

10

*v. Fenoglio*, No. 13-CV-193-NJR-DGW, 2015 WL 4941731, at *3 (S.D. Ill. Aug. 19, 2015) (ankle condition and accompanying pain and swelling constituted serious medical need); *Quinn v. Hardy*, No. 11-cv-1173, 2015 WL 1119409, at *4 (N.D. Ill. Mar. 10, 2015) (severe foot pain satisfied objective element of deliberate indifference claim); *Johnson v. Dunlap*, No. 09 C 4471, 2010 WL 3516101, at *3 (N.D. Ill. Aug. 30, 2010) (defendant conceded that ankle injury suffered while playing basketball was serious medical condition where ankle was placed in cast but x-rays showed no fractures or breaks). Although this case appears similar to *Harvey*, the plaintiff in *Harvey* admitted that he was able to continue playing basketball despite his injury and alleged pain. *Harvey*, 2015 WL 8329876, at *5. Here, however, no such evidence of Alvarez's abilities exist, with the Court instead presented with chronic complaints of pain over several years despite pain medication, a cortisone shot, an ankle brace, and a visit to a specialist, suggesting that Alvarez's ankle sprain amounted to more than just a minor ache or pain. *See Cumbee v. Ghosh*, No. 11-CV-3511, 2016 WL 5404597, at *4 (N.D. Ill. Sept. 28, 2016) (noting that a "common" injury can also be a "serious" one); *cf. Johnson*, 2010 WL 3516101, at *3 (fracture or break not necessary for ankle injury to be considered serious medical condition). Thus, Alvarez has at least raised a question of fact as to whether his ankle sprain, which he testified caused him persistent pain for a number of years thereafter, may be considered a serious medical condition.

### B. Subjective Element of Deliberate Indifference

The subjective element of a deliberate indifference claim requires that the defendant act with a sufficiently culpable state of mind—"something akin to criminal recklessness"—requiring "that the defendant be aware of and disregard an excessive risk of serious harm to the inmate." *Norfleet v. Webster*, 439 F.3d 392, 397 (7th Cir. 2006). For a medical professional to be held

11

liable under the deliberate indifference standard, he must make a decision that is such a substantial departure from accepted professional judgment, practice, or standards, as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Holloway v. Del. County Sheriff*, 700 F.3d 1063, 1073 (7th Cir. 2012) (quoting *Jackson v. Cotter*, 541 F.3d 688, 697 (7th Cir. 2008)). Neither negligence nor gross negligence constitutes deliberate indifference. *Farmer*, 511 U.S. at 836. The Court must examine the conduct of each doctor separately.

### 1. Dr. Carter

Alvarez cannot demonstrate that Dr. Carter deviated from professional standards of care in treating his ankle pain, nor can he hold Dr. Carter responsible for any alleged treatment delays. Dr. Carter can only be held responsible for treatment from the time Alvarez injured his ankle until May 10, 2012, when Dr. Carter ended his service as Medical Director at Stateville. Although Alvarez claims that Dr. Carter must have been aware that Alvarez faced a substantial risk of harm merely because Dr. Carter continued to treat Alvarez months after he suffered his ankle injury, Alvarez does not suggest or provide any evidence why the course of treatment Dr. Carter followed was inappropriate. Alvarez admits that he received continuous care for his ankle complaints under Dr. Carter, that Dr. Carter referred him to see a specialist at UIC, and that the medical staff always prescribed him sufficient medication to address his pain.

Alvarez takes issue with the fact that he never received an MRI, but prisoners are not entitled to "unqualified access to health care" or to demand a specific course of treatment. *Hudson v. McMillian*, 503 U.S. 1, 9, 112 S. Ct. 995, 117 L. Ed. 2d 156 (1992); *Petties v. Carter*, 836 F.3d 722, 731 (7th Cir. 2016) ("Prisoners are not entitled to state-of-the-art medical treatment."); *Arnett v. Webster*, 658 F.3d 742, 754 (7th Cir. 2011) (inmate not entitled to

12

"demand specific care" or to "the best care possible," although he is "entitled to reasonable measures to meet a substantial risk of serious harm"). Indeed, the Supreme Court has recognized that "the question whether an X-ray or additional diagnostic techniques or forms of treatment is indicated is a classic example of a matter for medical judgment," with a decision not to order an x-ray or similar measures at most amounting to medical malpractice. *Estelle*, 429 U.S. at 107. Thus, the fact that Alvarez never received an MRI, instead only several x-rays, does not lend itself to a finding of deliberate indifference against Dr. Carter.

Finally, Alvarez complains that Dr. Carter delayed his appointment with the UIC specialist, which happened three months after Dr. Carter made the referral. "To show that a delay in providing treatment is actionable under the Eighth Amendment, a plaintiff must also provide independent evidence that the delay exacerbated the injury or unnecessarily prolonged pain." *Petties*, 836 F.3d at 730. Alvarez provides no such independent evidence, either through an expert or in his own medical records, to suggest that the delay in seeing a specialist exacerbated his injury or unnecessarily prolonged his pain. *Cf. id.* at 732–33 (evidence in record suggested that delay in seeing specialist had detrimental effect where specialist noted pain and gapping due to lack of immobilization). Moreover, the record does not suggest that Dr. Carter was responsible for the delay or even knew of it; instead, Dr. Carter testified that he had no responsibility for scheduling the UIC visit once he made the referral and Alvarez has provided no contradictory evidence. *See Harvey*, 2015 WL 8329876, at *5 (although delay in inmate receiving x-ray was "extraordinary," no evidence in record that doctor was responsible for delay or aware of it). Therefore, because Alvarez has not shown that Dr. Carter's treatment was inadequate so as to rise to the level of a constitutional violation, the Court grants summary judgment for Dr. Carter.

## 2. Dr. Obaisi

Unlike with Dr. Carter, Alvarez has raised a question of fact as to whether Dr. Obaisi exhibited deliberate indifference in treating Alvarez's ankle pain. Dr. Obaisi saw Alvarez soon after his appointment with the UIC specialist. The UIC specialist recommended three things: (1) physical therapy, (2) an ankle brace, and (3) a follow-up appointment.[13] Alvarez argues that Dr. Obaisi exhibited deliberate indifference because he knew of the UIC specialist's recommendations but did not follow them, failing to obtain the ankle brace for Alvarez until April 2013, not pursuing the recommendation of physical therapy, and failing to facilitate a return to see the UIC specialist, as ordered. "A jury can infer conscious disregard of a risk from a defendant's decision to ignore instructions from a specialist." *Zaya v. Sood*, 836 F.3d 800, 806 (7th Cir. 2016). Here, although Dr. Obaisi did take some steps to obtain the ankle brace for Alvarez, having him fitted for it on August 25, 2012, the delay in receiving it until April 2013 raises questions, particularly considering that Alvarez raised the issue with Dr. Obaisi again in September 2012, at least in one visit and purportedly by letter as well. Although Dr. Obaisi indicates that he has no responsibility for ensuring that an inmate receives the ankle brace once the order is placed, a question arises as to whether he should have pursued the issue after Alvarez raised it with him in September 2012. *See Perez v. Fenoglio*, 792 F.3d 768, 781–82 (7th Cir. 2015) (once a prison administrator learns of an excessive risk to inmate health or safety, the refusal to exercise authority to address the issue may evidence deliberate indifference). Further, Dr. Obaisi does not provide any explanation for disregarding the UIC specialist's

---

[13] The Court notes some disagreement as to whether the physical therapy recommended amounted to exercises Alvarez was to perform in his cell or to physical therapy that the Stateville health care unit was to provide. It is undisputed, at least, that Alvarez did not receive physical therapy until 2014 and that an August 2013 note in Alvarez's chart indicates that the order for physical therapy should be cancelled.

recommendations to suggest that his decision to ignore them (at least with respect to the follow-up and the physical therapy) was based on any reasoned judgment. *See Petties*, 836 F.3d at 733 (finding that plaintiff had "the right for a jury to hear Dr. Obaisi's justifications for his treatment decisions (or lack thereof) and to determine if Dr. Obaisi was deliberately indifferent, rather than simply incompetent, in treating his injury" where Dr. Obaisi refused to order physical therapy after specialist recommended it); *Buford v. Obaisi*, No. 13 C 176, 2016 WL 4611384, at *6 (N.D. Ill. Sept. 6, 2016) (finding material issue of fact where Dr. Obaisi could not recall why he did not recommend physical therapy for plaintiff and "provided no rationale for failing to order physical therapy until over a year after it was recommended"). *But see Harvey*, 2015 WL 8329876, at *5 (doctor not liable for deliberate indifference where failure to ensure that inmate received prescribed physical therapy for sprained ankle amounted to nothing more than mere negligence). And although Dr. Obaisi suggests that Alvarez cannot demonstrate harm, Alvarez suggests that the fact that he experienced chronic pain continuing into 2014 and that the physical therapy he received then appears to have resolved his issues at least creates a question on the issue. *See Cumbee*, 2016 WL 5405597, at *5 (plaintiff's medical records and testimony created question as to whether delays harmed plaintiff). Because these issues cannot be resolved at the summary judgment stage, Alvarez's claim against Dr. Obaisi must proceed to trial.[14]

---

[14] Because Alvarez's claim against Dr. Obaisi remains, the Court must address the Wexford Defendants' additional argument that Alvarez has not shown that he is entitled to punitive damages because he has not demonstrated that Dr. Obaisi's conduct was "motivated by evil motive or intent," or that it involved "reckless or callous indifference" to his rights. *Alexander v. City of Milwaukee*, 474 F.3d 437, 453 (7th Cir. 2007) (quoting *Smith v. Wade*, 461 U.S. 30, 56, 103 S. Ct. 1625, 75 L. Ed. 2d 632 (1983)). Alvarez does not respond to this argument, conceding the point. *See Bonte v. U.S. Bank, N.A.*, 624 F.3d 461, 466 (7th Cir. 2010) ("Failure to respond to an argument . . . results in waiver."). Therefore, the Court dismisses Alvarez's request for punitive damages against Dr. Obaisi.

### 3. Dr. Funk

Because § 1983 creates a cause of action based on personal liability and predicated upon fault, "to be liable under § 1983, the individual defendant must have caused or participated in a constitutional deprivation." *Pepper v. Vill. of Oak Park*, 430 F.3d 805, 810 (7th Cir. 2005) (citation omitted) (internal quotation marks omitted). Dr. Funk never personally saw Alvarez. Instead, Alvarez seeks to hold Dr. Funk liable based on two letters he sent to Dr. Funk in October 2011 and February 2012 complaining about his medical care. "[A] prison official's knowledge of prison conditions learned from an inmate's communications can, under some circumstances, constitute sufficient knowledge of the conditions to require the officer to exercise his or her authority and to take the needed action to investigate and, if necessary, to rectify the offending condition." *Vance v. Peters*, 97 F.3d 987, 993 (7th Cir. 1996).

Dr. Funk argues that there is no evidence that he ever received Alvarez's letters. Courts differ as to whether the existence of the letter itself is enough to create an issue of fact as to a defendant's knowledge, often looking for other evidence as to whether defendants would have received or reviewed correspondence from inmates or whether such tasks were delegated to others. *See Taylor v. Garcia*, No. 11 C 7386, 2015 WL 5895388, at *4 (N.D. Ill. Oct. 6, 2015) (comparing cases and concluding that "[s]ending letters to a prison official, even without proof of receipt, can create a triable issue of fact as to knowledge depending on their content and manner of transmission"). For example, in *Johnson v. Snyder*, the record affirmatively showed that the defendant did not personally receive inmate correspondence related to grievances and so the court found that a plaintiff's letters to the defendant did not create a genuine issue of fact concerning the defendant's knowledge of the alleged unconstitutional violation. 444 F.3d 579, 584 (7th Cir. 2006), *overruled on other grounds by Hill v. Tangherlini*, 724 F.3d 965 (7th Cir.

2013). On the other hand, the court in *Patterson v. Wexford Health Sources* found that the existence of letters from the plaintiff, which the defendants disputed ever receiving, created a question of fact as to the defendants' awareness of whether the plaintiff received proper medical care and were required to take corrective action. No. 13 C 1501, 2016 WL 723018, at *7 (N.D. Ill. Feb. 22, 2016). *But see Keller v. Elyea*, 496 F. App'x 665, 667 (7th Cir. 2012) (upholding summary judgment where plaintiff did not produce evidence that doctor knew of alleged violations by treating medical staff or had reviewed plaintiff's letters, distinguishing *Reed v. McBride*, 178 F.3d 849, 854 (7th Cir. 1999), where supervisors acknowledged receiving plaintiff's complaint letters). Here, although Defendants knew of the letters Alvarez references from the beginning of this case, as he attached them to his complaint, they do not provide any evidence to suggest that Dr. Funk would not have personally received inmate correspondence or to otherwise refute the fact that he never received the October 2011 or February 2012 letters. Thus, there is at least a question as to his awareness of Alvarez's medical needs in October 2011 and February 2012.

Nonetheless, proceeding as if Dr. Funk received these letters, Alvarez has no evidence that, had Dr. Funk investigated at the time he received those letters, he would have found that Alvarez was receiving constitutionally deficient medical care. *See Riley El v. Godinez*, No. 13 C 5768, 2016 WL 4505038, at *15 (N.D. Ill. Aug. 29, 2016) (plaintiff's claim that non-medical defendants failed to investigate and intervene in his medical treatment failed where plaintiff received constitutionally adequate medical care); *Coleman v. Hardy*, No. 12 C 03842, 2014 WL 4911305, at *5 (N.D. Ill. Sept. 30, 2014) (even if defendants had received letters plaintiff claimed to have sent, plaintiff presented no evidence that care he received fell below professional standards to support claim of deliberate indifference). Therefore, the Court cannot impose any

liability on Dr. Funk based on Alvarez's letters to him and the Court grants summary judgment in Dr. Funk's favor.

### 4. Wexford

Alvarez also brought a claim against Wexford, claiming Wexford pursues "cost-cutting policies" instead of providing him and other inmates with adequate medical treatment. Doc. 115 ¶ 13. To establish this claim, Alvarez must show that Wexford has an official policy, pattern, or practice that caused a constitutional violation. *See Chatham v. Davis*, 839 F.3d 679, 685 (7th Cir. 2016). Wexford argues that Alvarez has not produced any evidence of such a policy, pattern, or practice as required under *Monell v. Department of Social Services*, 436 U.S. 658, 694, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978). Alvarez does not respond to this argument, essentially conceding the issue. *See Bonte*, 624 F.3d at 466. Therefore, the Court grants summary judgment for Wexford.

### 5. IDOC Defendants

Because the IDOC Defendants are not medical professionals responsible for administering medical care, they are entitled to rely on and defer to the judgment of medical professionals. *McGee v. Adams*, 721 F.3d 474, 483 (7th Cir. 2013); *King*, 680 F.3d at 1018. The IDOC Defendants may be found to have been deliberately indifferent to Alvarez's medical needs, however, if they had actual knowledge or reason to believe that medical personnel were not treating or were mistreating Alvarez. *King*, 680 F.3d at 1018.

Here, Hardy responded to two grievances Alvarez filed, signing off on the grievance officer's report that Alvarez appeared to be receiving appropriate medical care at the time on January 3, 2012, and then determining that Alvarez's July 8, 2012 grievance was not an emergency but rather should be submitted in the normal manner. Hardy's actions concerning the

grievances cannot form the basis of a deliberate indifference claim, as "the alleged mishandling of [A]lvarez's grievances by persons who otherwise did not cause or participate in the underlying conduct states no claim." *Owens v. Hinsley*, 635 F.3d 950, 953 (7th Cir. 2011). Hardy was also entitled to rely on the medical staff's judgment in signing off on the initial grievance. *See Adams v. Durai*, 153 F. App'x 972, 975 (7th Cir. 2005) ("An administrator does not become responsible for a doctor's exercise of medical judgment simply by virtue of reviewing an inmate grievance[.]"); *Greeno v. Daley*, 414 F.3d 645, 655–56 (7th Cir. 2005) (corrections complaint appeals examiner not deliberately indifferent where he reviewed complaints and verified with medical officials that inmate was receiving medical treatment).

Alvarez also contends that he sent Hardy and Brown-Reed several letters in October 2011 and January 2012 concerning his medical care. As with the letters sent to Dr. Funk, their submission is enough to at least suggest that Hardy and Brown-Reed knew of Alvarez's complaints. *See Taylor*, 2015 WL 5895388, at *4. But even so, any inaction on Hardy's or Brown-Reed's part in response does not demonstrate deliberate indifference because the evidence demonstrates that, at those times, the medical staff at Stateville was treating Alvarez in a constitutionally adequate manner. *See Riley El*, 2016 WL 4505038, at *15 (claim against defendants for failure to investigate and intervene failed where there was no underlying constitutional violation for inadequate medical care). Therefore, the Court grants summary judgment for the IDOC Defendants.[15]

---

[15] The IDOC Defendants also argue that Alvarez cannot recover monetary damages against them in their official capacity. Because the Court finds for the IDOC Defendants, the Court need not address this argument.

## CONCLUSION

For the foregoing reasons, the Court grants in part and denies in part the Wexford Defendants' motion for summary judgment [112], grants the IDOC Defendants' motion for summary judgment [116], and grants the Wexford Defendants' motion to strike [137]. The Court strikes the declaration of Edgar Naranjo. The Court enters judgment for Dr. Carter, Dr. Funk, Hardy, Brown-Reed, and Wexford. Alvarez's claim against Dr. Obaisi remains pending, although Alvarez cannot pursue punitive damages against him.

Dated: December 5, 2016

_____
SARA L. ELLIS
United States District Judge